IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 1:23-cr-00339 |
| | ) | |
| SAMUEL WARREN | ) | |
| | ) | |
| | ) | |

**GOVERNMENT'S MODIFIED SENTENCING MEMORANDUM and
MOTION FOR SENTENCING PURSUANT TO SECTION 5K1.1 OF THE U.S.
SENTENCING GUIDELINES**

*ELECTRONICALLY FILED*

The United States of America, by counsel, files its memorandum in support of sentencing

in this action, which is currently scheduled for March 11, 2026. For the reasons stated below, the

United States respectfully asks this Court to depart downward four levels from the applicable

guidelines, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (U.S.S.G.),

and sentence Defendant Samuel Warren to 18 months' imprisonment followed by three years of

supervised release.

**I.      Factual Background**

From 2010 to 2022, Samuel Warren (the "Defendant") worked as a correctional officer

("CO") at the Eastern Correctional Institution ("ECI") in Westover, Maryland. As detailed below,

while working at ECI, the Defendant repeatedly punched an inmate, K.K., without justification.

Then the Defendant lied about the assault—a matter within the jurisdiction of the Federal Bureau

of Investigation ("FBI"), an agency of the United States—in a written report, with the intent to

keep investigators, including FBI agents, from learning of the incident. The Defendant admits that

his conduct violated 18 U.S.C. §§ 242 and 1519.

Specifically, on July 12, 2021, the Defendant, then age 35, was working in ECI's Housing Unit 4. Late that afternoon, an inmate, K.K., entered the unit to begin his shift as an Inmate Observation Aid ("IOA"), a position typically assigned to inmates with excellent disciplinary records. While another officer was frisking K.K. at the unit's entrance, the Defendant became irritated with K.K. about the fact that K.K. was wearing a face mask (because of the COVID-19 pandemic) that was hanging below his nose. After the frisk was complete, K.K. walked onto the tier and commented that either the Defendant or his interaction with the Defendant had been "crazy." Further irritated by that comment, the Defendant decided to retaliate against K.K by forcing him to undergo a strip search that the Defendant would not ordinarily have conducted. To that end, the Defendant instructed K.K. to walk to the unit's property room, where strip searches were routinely conducted. K.K. complied and walked to the property room without handcuffs. The Defendant followed K.K. to the property room, as did two other officers, Correctional Officers Wilson and Daubach.

Once inside the property room, K.K. walked to the back of the room, where instructions for strip searches were posted on a double door. Per protocol, K.K. faced the door and began to read the instructions aloud. However, shortly thereafter, K.K. turned toward the officers to make the lewd comment that, if K.K. were facing the door, the officers would not be able to see his "dick." The Defendant instructed K.K. to turn to face the door. K.K. did so, and then turned around again to make the same lewd comment. In response, the Defendant asked K.K. if he liked his job (as an IOA). K.K. replied that he loved his job. The Defendant then stated that K.K. had lost his job. Notably, despite making inappropriate comments, K.K. did not pose a threat of harm or escape, and K.K. had begun to disrobe in compliance with the strip search instructions.

Nonetheless, the Defendant told K.K. that they would now engage in a monitored strip search procedure, which would involve handcuffing K.K. and escorting him to a cell where

correctional officers would disrobe him. The Defendant handcuffed K.K. behind his back and, with K.K.'s shoes off and pants lowered, began to escort him toward the property room door. On their way to the door, K.K. either pulled away from the Defendant or tripped because he was shuffling with lowered pants, breaking the Defendant's grip on his arm. Again, despite this motion, K.K. did not pose a threat of harm or escape, and there was no justification to use force against him, beyond the Defendant resecuring his grip on K.K.'s arm. Nevertheless, the Defendant threw K.K. to the floor and punched him five or six times in the face and head, all while K.K. was handcuffed behind his back and lying on his side on the floor. During the assault, K.K. did not try to get up, kick, punch, spit, or act in any way that would have justified the use of force. The Defendant understood in the moment that the assault was entirely unjustified and wrong. The Defendant observed that, during the assault, COs Ananias Wilson and Neil Daubach were in positions that allowed them to see and hear everything that occurred.

After the assault, other officers entered the property room and escorted K.K. for a medical evaluation and a monitored strip search. At that time, K.K. was bleeding and visibly injured.

That evening, the Defendant wrote a false account of these events in his incident report and read that report aloud to several correctional officers, including COs Wilson and Daubach Among other falsehoods in his report, the Defendant omitted that he had punched K.K. multiple times without justification. The Defendant read his report aloud in order to provide COs Wilson and Daubach with an opportunity to match their reports to his. Both COs then also read their reports aloud, with accounts that largely copied the Defendant's false account. Subsequently, the Defendant and CO Wilson submitted those same false reports to a supervisor who was investigating the incident. However, the Defendant later learned that CO Daubach submitted a different false report that entirely omitted the fact that CO Daubach had been in the property room during the assault.

On May 20, 2022, the Defendant furthered the cover-up by lying to an investigator who was reviewing the K.K. incident on behalf of the Maryland Department of Public Safety and Correctional Services ("DPSCS"). During an interview with the DPSCS investigator, the Defendant reiterated and embellished his prior false account of the incident, and again insisted that he had not assaulted K.K.

## II.    Criminal History

The United States agrees with Probation that the Defendant falls within Criminal History Category I.

## III.    Guidelines Calculation

The United States agrees with Probation's total offense level calculation in the initial presentence report. The presentence report calculates the total offense level, including acceptance of responsibility, to be 19, resulting in an advisory guidelines sentence of 30-37 months.

## IV.    U.S.S.G. § 5K1.1 Substantial Assistance to Authorities

The United States Sentencing Guidelines states that appropriate reduction in sentence shall be determined by the Court for reasons stated that may include, but are not limited to, consideration of the following:

(1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)    the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)    the nature and extent of the defendant's assistance;

(4)    any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5)    the timeliness of the defendant's assistance.

In August 2023, the Defendant, along with his attorney, met with the Government. During that first meeting, the Defendant described his unjustified use of force against K.K. and the actions he and the other correctional officer took to conceal the assault. Specifically, he explained how he and other officers agreed that the video should be deleted, and how they then coordinated their lies in their reports to cover up what the Defendant had done to K.K. in the property room. The Defendant admitted to lying to Captain Victoria Matthews about K.K's injuries after she inquired about the use of force and described Jermaine Sturgis's role in instigating the deletion of the video that documented K.K.'s injuries and accusations against the Defendant. Over the course of the next four months, the Defendant met with the Government three more times and was open and candid at each meeting.

The Government expanded its investigation to include a conspiracy to coverup of the assault, which involved four other officers, Jermaine Sturgis, Neil Daubach, Daric Evans and David Quillen. This ultimately led to the Government securing guilty pleas with cooperation agreements from two co-conspirators, Evans and Quillen; and an indictment charging Neil Daubach and Jermaine Sturgis with conspiracy, falsification of records, destruction of evidence, witness tampering, and false statements. Neil Daubach ultimately pleaded guilty to falsification of records and witness tampering.

In preparation for his trial testimony with respect to Jermaine Sturgis, the Defendant continued to cooperate and meet with the Government upon request. At trial, the Defendant testified truthfully, offering a complete, unvarnished narrative of the events, including his role in K.K's assault and the subsequent coverup. He also explained Jermaine Sturgis's involvement in the deletion of the video. In part, due to the Defendant's testimony, the jury found Jermaine Sturgis guilty of conspiracy and false statements. Considering the Defendant's substantial assistance to

the Government's prosecution, the Government recommends a four-level departure, from 19 (30 – 37 months) to 15 (18 – 24 months).

**V.      Section 3553(a) Factors**

Even considering the Defendant's substantial assistance, this Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Taking into consideration all of the Section 3553(a) sentencing factors, a sentence of 18 months of incarceration followed by three years of probation is the appropriate sentence.

**A.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The nature and circumstances of the Defendant's criminal conduct warrant a jail sentence. Defendant's assault on K.K. was unprompted, unwarranted, and purely retaliatory. Defendant repeatedly punched K.K., an inmate in his custody and care, causing a black eye, facial abrasions and lacerations, elbow abrasions, and bruising about the head and upper body.

Still, there are mitigating circumstances that justify an 18-month jail sentence. From his first interview with the Government, the Defendant was forthcoming about his wrongdoing and did not minimize his conduct by falsely claiming that K.K. behaved aggressively or in a threatening manner. The Defendant has expressed remorse for the assault and the coverup and has since provided substantial assistance, which led to the prosecution and conviction of Daric Evans, David Quillen, Neil Daubach, and Jermaine Sturgis, as explained above. From the time the Defendant pleaded guilty through the trial of Jermaine Sturgis, he maintained his cooperation and met with the prosecution when needed.

**B.      The Need to Protect the Public from Further Crimes of the Defendant.**

The Defendant has no prior criminal history. Since the Defendant left ECI, the Defendant has found and maintained gainful employment and is generally a contributing member of society.

The only need to protect the public from the Defendant's crimes arises specifically in the context of him being employed as a law enforcement officer, for which he is now disqualified due to his felony conviction.

        **C.**        **Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Correctional officers are trained that force cannot be used against an inmate to punish or to cause wanton pain and suffering. Officers who assault inmates in their custody injure and harm the very people they are sworn to protect. As the Court is aware, illegitimate uses of force by a correctional officer jeopardize the safety of everyone in a prison – both inmates and fellow officers. Allowing unreasonable uses of force to go unchecked could have a terrible ripple effect that puts all officers, including the ones who follow the use of force policy and abide by the law, in danger of serious harm. If the inmates learn that an officer who used excessive force has not been disciplined or punished, it could cause inmates to become violent in their dealings with all officers.

Similarly, correctional officers who refuse to report misconduct threaten safety and order within the prison, as prison supervisors who are unaware of the problem cannot take appropriate corrective action. When unreasonable or excessive use of force goes unreported by officers who witness the use of force, they in turn stymie criminal investigations by federal law enforcement. Thus, successful prosecutions rely heavily on the cooperation of potential defendants who are willing to acknowledge their own wrongdoing and testify against their fellow officers, despite the pressure to remain silent. Here, once the Defendant pleaded guilty, he was forthcoming with the Government, in stark contrast to Sturgis and Daubach, who continued to lie and obfuscate. The Government believes that a downward departure of four levels for the Defendant would send the appropriate message to him and future defendants in his position: offering honest and truthful testimony in a federal investigation will be reflected in their sentence.

**D.      The Need to Afford Adequate Deterrence to Criminal Conduct**

The Court should consider the need for specific and general deterrence. One of the sentencing goals under §3553(a) is to warn the Defendant, members of law enforcement, and the general public that committing these types of violations will have consequences. Law enforcement officers who violate an inmate's rights also violate public trust, and in turn, public safety suffers as a result. In this vein, the message should be delivered that assaults of inmates and obstruction will have appropriate repercussions. An 18-month jail sentence for a law enforcement officer who abused his authority to deprive an individual his rights, even one who cooperated, reflects the seriousness of the offense by demonstrating to the public that when an officer violates his oath and public trust, there will be significant consequences.

**VI.      Conclusion**

Based on the foregoing and the Defendant's substantial assistance during the pendency of the investigation and prosecution, the Government believes that a downward departure in his U.S. Sentencing Guidelines range is warranted. According to the Presentencing Investigation Report, the Defendant has a total offense level of 19 (30-37 months) when the three-level reduction for acceptance of responsibility and timely notifying the Government of his intention to plead guilty (USSG § 3E1.1(b)) are included.  In light of Defendant's substantial assistance, the Government believes that a four-level downward departure is appropriate, which results in a reduced offense level of 15 (18-24 months) and recommends a sentence of 18 months' imprisonment followed by three years of supervised release.

Respectfully submitted,

KELLY O. HAYES
United States Attorney
District of Maryland

*/s/ Paul Budlow*
By: Paul Budlow
Assistant United States Attorney
36 S. Charles Street 4th Fl.
Baltimore, MD 21201
Tel. (410) 209-4917
paul.budlow@usdoj.gov

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

*/s/ Anita T. Channapati*
By: Anita T. Channapati
Trial Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel. (202) 598-1033
anita.channapati@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for the defendant.

 s/ *Anita T. Channapati*
Anita T. Channapati
Trial Attorney
